**ESTATE of Julius B. CRONHEIM, Deceased, Richard B. Cronheim, Executor, and Emily F. Cronheim, Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 17295.

United States Court of Appeals
Eighth Circuit.

Oct. 15, 1963.

Millard Backerman, St. Louis, Mo., for petitioners; Alfred O. Heitzmann (of Stolar, Kuhlmann, Heitzmann & Eder), St. Louis, Mo., on the brief.

Richard W. Perkins, Atty., Dept. of Justice, Tax Division, for respondent; Louis F. Oberdorfer Asst. Atty. Gen., Lee A. Jackson, Harry Baum, Attys., Tax Division, on the brief.

Before JOHNSEN, Chief Judge, and MATTHES and MEHAFFY, Circuit Judges.

MATTHES, Circuit Judge.

As in United States v. Frankel, 8 Cir., 302 F.2d 666 (1962), cert. denied, 371 U.S. 903, 83 S.Ct 208, 9 L.Ed.2d 165 (1962), and Estate of Olsen v. Commissioner, 8 Cir., 302 F.2d 671 (1962), cert. denied, 371 U.S. 903, 83 S.Ct. 208, 9 L.Ed.2d 165 (1962), we again have occasion to consider the treatment for tax purposes to be accorded a payment to the widow of a deceased former executive of a corporation. Specifically, the question here presented is whether the payments aggregating $23,853.87 made by Fulton Bag & Cotton Mills (Fulton) to Emily F. Cronheim (widow) in 1955 were gifts within the meaning of § 102(a) of the Internal Revenue Code of 1954 and excludable from petitioners' gross income.[1] In an unreported decision, the Tax Court upheld the Commissioner's determination that $18,853.87 of the payments ($23,-853.87 minus $5,000 as excludable employee death benefits under § 101(b) of the 1954 Internal Revenue Code) was taxable as income under § 61(a) (1) of the 1954 Code.[2] From this decision, taxpayer petitions us for review.

---

1. § 102(a) provides:
   "Gross income does not include the value of property acquired by gift, bequest, devise, or inheritance."

2. § 61(a) (1) provides:
   "Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items:
   "(1) Compensation for services, including fees, commissions, and similar items;
   * * *"

In Commissioner v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960), the Supreme Court, while refusing to accede to the Government's suggestion that a new test be promulgated to serve as a standard to be applied by the lower courts and by the Tax Court in dealing with the numerous cases presenting the gift vis-a-vis taxable income question, did review the law in this area. As we understand the teachings of Duberstein, the critical consideration is the transferor's intention, or, as stated by the Court, "(w)e take it that the proper criterion, established by decision here, is one that inquires what the basic reason for his [transferor] conduct was in fact —the dominant reason that explains his action in making the transfer." 363 U.S. at 286, 80 S.Ct. at 1197, 4 L.Ed.2d 1218. The Court did not spell out or limit the factors to be considered in resolving the motive or reason which prompted the transferor to make the payment, but stated that "(t)he conclusion whether a transfer amounts to a 'gift' is one that must be reached on consideration of all the factors." 363 U.S. at 288, 80 S.Ct. at 1198, 4 L.Ed.2d 1218.

In Bogardus v. Commissioner, 302 U. S. 34, 39, 58 S.Ct. 61, 64, 82 L.Ed. 32 (1937), a prior case also presenting the issue whether certain payments were additional compensation or tax-free gifts, the Court, in a divided opinion, found that the fact-finder's determination of the issue was a conclusion of law or at least a mixed question of law and fact and therefore that the reviewing court could substitute its judgment for that of the fact-finder. Departing from this prior holding on the scope of review, the Court in Duberstein, supra, announced:

"Decision of the issue presented in these cases must be based ultimately on the application of the fact-finding tribunal's experience with the mainsprings of human conduct to the totality of the facts of each case. The nontechnical nature of the statutory standard, the close relationship of it to the data of practical human experience, and the multiplicity of relevant factual elements, with their various combinations, creating the necessity of ascribing the proper force to each, confirm us in our conclusion that primary weight in this area must be given to the conclusions of the trier of fact. Baker v. Texas & Pacific R. Co., 359 U.S. 227 [79 S.Ct. 664, 3 L.Ed.2d 756]; Commissioner v. Heininger, 320 U.S. 467, 475 [64 S.Ct. 249, 254, 88 L.Ed. 171]; United States v. Yellow Cab Co., 338 U.S. 338, 341 [70 S.Ct. 177, 179, 94 L.Ed. 150]; Bogardus v. Commissioner, supra [302 U.S.], at 45 [58 S.Ct. at 66, 82 L.Ed. 32], (dissenting opinion)." 363 U.S. at 289, 80 S.Ct. at 1198, 1199, 4 L.Ed.2d 1218.[3]

The Court further stated that appellate review of determinations in this area must be quite restricted and that on review of non-jury trials, the trial judge's findings must stand unless "clearly erroneous."[4]

3. In United States v. Frankel, supra, 302 F.2d 666, 670, we stated that in our view, the Duberstein decision "does not change the criterion laid down in Bogardus v. Commissioner * * * for determining what are 'gifts' within the meaning of the applicable statute." Duberstein refers to "the Bogardus criterion" as being simply that "the most critical consideration * * * is the transferor's 'intention'", on which it says "the Court was agreed" in the Bogardus case. 363 U.S. at 285 and 286, 80 S.Ct. at 1196 and 1197, 4 L.Ed.2d 1218. It is obvious, however, that Duberstein does change the *standard of review* and adopts the rule promulgated by the dissent in Bogardus. See Fn. 11, 363 U.S. at 289, 80 S.Ct. at 1198–1199, 4 L.Ed.2d 1218. Implicit in our affirmance of the trial court in Frankel is recognition of the more limited scope of review in this area as established in Duberstein.

4. " 'A finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' United States v. United States Gypsum Co., 333 U.S. 364, 395 [68 S.Ct. 525, 541–542, 92 L.Ed. 746]. The rule itself ap-

With these principles in mind, we turn to the basic facts—facts which were presented to the Tax Court on stipulation of the parties or on evidence which in the main stands uncontradicted.

At the time of Julius B. Cronheim's death on May 15, 1955, he was a vice-president and director of Fulton, had an annual salary of $44,200, and had been employed by Fulton for 56 years. As stated, Emily F. is his surviving spouse and Richard B. Cronheim, a son, is the duly appointed and qualified executor of his father's estate. On the date of his death, Julius owned 1,000 and Emily 200 shares of the 480,000 outstanding shares of the common stock of Fulton.

On May 31, 1955, the board of directors of Fulton, in a special meeting, adopted the following resolutions:

"RESOLVED, That a committee be appointed to draft a resolution regarding the passing of Mr. Julius B. Cronheim, and that a copy of the resolution be spread on the minutes and sent to the family of Mr. Julius B. Cronheim.

"On motion, duly seconded, it was

"RESOLVED, That the salary of Mr. Julius B. Cronheim be continued at the same rate through our fiscal year ending November 30, 1955."

Pursuant to the first above-quoted resolution, the following resolution was spread upon the minutes of Fulton some time after adjournment of the meeting:

"WHEREAS, on May 15, 1955, Almighty God removed Julius B. Cronheim from this earth, and we are thereby deprived of his friendship and counsel, and

"WHEREAS, Julius B. Cronheim loyally served this Company and the Textile Bag Industry for nearly fifty-six years, beginning as office boy and moving up through his own intelligence, ability and personality to a position of highest respect and responsibility, and

plies also to factual inferences from undisputed basic facts, * * * as will on many occasions be presented in this area."

"WHEREAS, we recognize his talent to train and bring out the latent abilities of young men and to encourage and foster sound and fair thinking and industry on the part of all of those with whom he was associated;

"THEREFORE, BE IT RESOLVED that there be recorded in the minutes of this meeting our feeling of affection and respect for him and our deepest sympathy for his family."

On June 1, 1955, Norman E. Elsas, president and chairman of the board of directors of Fulton, wrote a letter to Richard B. Cronheim, reading in part as follows:

"At a Special Meeting of the Board of Directors yesterday, a Resolution was passed expressing the deep sorrow of the members of the Board occasioned by the absence of your Father. The wording of this Resolution is being undertaken and will be spread upon the minutes of the meeting, and appropriate copies forwarded to Em and to you.

"Immediately thereafter the Board voted to continue payment of Julius' salary, at the current rate, (payable to Em), for the rest of our fiscal year—through November 30, 1955. Needless to say, I would have liked to have seen this period extended further, but under the present circumstances as to Company earnings, (or rather, the lack of them), I feel that the decision was a proper one.

"(So that you will be familiar with the practice of the Board in similar situations in the past, salary payment has been continued for periods varying from two to eight months. In the case of my Father, I remember quite clearly it was a little less than five months)."

363 U.S. at 291, 80 S.Ct. at 1199–1200, 4 L.Ed.2d 1218.

Richard responded to this letter by requesting that the checks be made payable and deposited to the credit of Emily F. Cronheim.

Fulton paid Emily the sum of $23,853.87 during the taxable year 1955. On its books and records and on its return for the taxable year ended November 26, 1955, Fulton deducted the salary paid Julius B. Cronheim from December 1, 1954, through his death on May 15, 1955, amounting to $20,766 under the heading of "Compensation of Officers." The $23,853.87 paid to Emily during the remainder of the fiscal year which ended November 26, 1955, was reflected on the books of Fulton under the heading of "Extraneous Payments." On its income tax return Fulton deducted the $23,853.87 paid to Emily under the heading of "Salaries and Wages." Emily and the estate of her deceased husband filed a joint federal income tax return for 1955 and did not report the amount paid to Emily by Fulton as income.

Fulton did not have a severance pay or pension plan in effect when Julius died; however, upon the death of long-time officers or executives, Fulton had continued the salary of such officer for varying periods of time. In the five such cases prior to the death of Julius the salary continuation had varied from two months up to eight or nine months.

The board of directors was unaware of and made no particular investigation into Emily's financial situation. Emily was the beneficiary of $87,833 of insurance on Julius' life. Policies totaling $22,500 were pledged to secure a loan in the amount of $19,500 outstanding at Julius' death.

Petitioners assert that in quest of the payor's intention, a number of objective indicia have come into common use, and are most clearly formulated in Florence S. Luntz, 29 T.C. 647, 650 (1958), and recognized in Poyner v. Commissioner, 4 Cir., 301 F.2d 287, 291 (1962), as follows: (1) the payments were made to the wife of the deceased employee and not to his estate; (2) the payor had no obligation to pay any additional compensation to the deceased employee; (3) the payment was not made in anticipation of economic benefit to the payor; (4) the wife of the deceased employee had performed no services for the payor; (5) the services of the deceased employee had been fully compensated. The argument is then advanced that all of the foregoing criteria are fully satisfied by the facts. But, as pointed out in the brief filed on behalf of the Commissioner, factors (1), (4) and (5) are generally present in "widow bonus" cases and manifestly do not compel a "gift" conclusion as a matter of law. Furthermore, the Supreme Court in Duberstein, supra, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218, made it abundantly clear that the criteria or factors to be considered in searching the payor's dominant motive or reason for making the payment are not limited to the five factors delineated in Poyner.[5] Indeed, in Poyner the Fourth Circuit stated:

"An enumeration of the criteria, by which the trier of fact shall determine in every type of case what that dominant reason is, was deemed inadvisable, if not futile. The Court preferred to leave the development of such criteria to a case-by-case approach in the lower courts.

"On the other hand, Duberstein cannot be read as limiting inquiry by the trier of fact solely to the factors recognized by the earlier decisions. The objective is to discover which motive is dominant in a field of co-existing motives. In the task of sorting out the varying motives, the development of more reliable criteria by the triers of fact should not be curtailed. Indeed, the Tax

5. Petitioners do not contend that these five factors are the exclusive criteria a fact-finder can consider. For example, petitioners additionally assert that: "(1) neither Julius nor Emily owned a substantial interest in Fulton; (2) the payments were made over a relatively brief period of time; and (3) the amount paid Emily was determined in light of what Fulton could afford."

Court since Duberstein has considered it necessary to inquire into the widow's stock holdings in the company and the knowledge or lack of it on the part of the Board of her financial status following the death of her husband. The Tax Court in the present case also seems to have thought that the directors' knowledge of 'the widow's needs' was an important factor. These subjects are certainly relevant, and inquiry may properly be directed to them, and whatever other factors the trier of fact might think helpful." 301 F.2d at 292.

In resolving the controversy against petitioners, the Tax Court fully recognized that inquiry into the dominant reason for Fulton's action was basic and essential in discharging its fact-finding function. From its opinion it plainly appears that pursuant to such inquiry the Tax Court carefully analyzed and considered all relevant facts and circumstances, giving particular expression to the following pertinent factors: (1) The board of directors of Fulton made no effort to learn of Emily's need, and in fact had no knowledge thereof. The Tax Court concluded: "Emily's needs were neither the prerequisite for payment nor the measure of payment;" (2) the resolutions continuing the salary of Julius and eulogizing him did not specifically mention Emily either by name or as the widow; the memorial resolution was directed to "the family" and no payee was designated for the future salary payments; (3) three directors of Fulton testified that their intent in continuing the salary of Julius was to help Emily adjust to her new standard of living, although Julius did not die at an early age. The Tax Court concluded that the intent of the corporation was to give tangible expression of its appreciation for the years of faithful services to it by Julius; (4) Fulton followed a practice of salary continuations for varying short periods of time to widows and surviving minor children of deceased, long-time executives. Finding that pay-

ments had been made in *all* such instances in the past, the Tax Court held that "it is a reasonable conclusion that such an officer would expect that his survivors would similarly be accommodated;" (5) correspondence between Richard Cronheim and Fulton's president and the desire of certain board members to formalize the providing for survivors of deceased officers evidenced an obligation on the part of Fulton to make some payment to Emily; (6) the continuation resolution authorizing the payments used the term "salary," and was separate and distinct from the memorial resolution; (7) Fulton treated the payments as compensation on its income tax return.

Petitioners argue that the foregoing facts and circumstances are insufficient to support the inferences and ultimate conclusion that the amount paid to Emily was compensatory and not donative in nature. This insistence is bottomed upon their evaluation of the force of our holdings in United States v. Frankel, supra, 302 F.2d 666, and Estate of Olsen v. Commissioner, supra, 302 F.2d 671. We are not persuaded that our opinions in Frankel and Olsen compel a reversal of the decision herein. While there are some factual similarities in Frankel, Olsen, and the instant case, it by no means follows that we are required to reach the same result. The ultimate question in each case remains basically one of fact "for determination on a case-by-case basis." Commissioner v. Duberstein, supra, 363 U.S. at 290, 80 S.Ct. 1199, 4 L.Ed.2d 1218.

Certainly there are factual distinctions between the case before us and Olsen, where we reversed the Tax Court's determination that a sum of $5,000 "payable forthwith in cash" to a widow was not a gift. In Olsen, the formal resolution specifically provided that the payments were to be made directly to the widow; there was evidence that Mr. Olsen's death was quite sudden, and that the company felt that the widow "probably could use the money under those circumstances;" the payment was not measured in accord-

ance with Mr. Olsen's salary; and the company had no plan or policy for making payments to widows of deceased officers or employees, even though on one prior occasion it had made a payment to a widow of a vice-president. Here, to illustrate but one of several important differences from Olsen, it is evident that, while no formalized plan existed, Fulton followed the practice of continuing the salary for varying periods of time to widows and surviving minor children of deceased, long-time executives. Such a policy or practice, while not necessarily decisive, is unquestionably a relevant circumstance to be taken into consideration by the fact-finding tribunal in determining the basic or dominant reason motivating the payment in question. See Bounds v. United States, 4 Cir., 262 F.2d 876 (1958); Simpson v. United States, 7 Cir., 261 F.2d 497 (1958), cert. denied, 359 U.S. 944, 79 S.Ct. 724, 3 L.Ed.2d 677 (1959); Bausch's Estate v. Commissioner of Internal Revenue, 2 Cir., 186 F.2d 313 (1951).

In attempting to refute the contention that Fulton's policy was to make such payments to widows of its officers, petitioners rely strongly upon United States v. Reed, 6 Cir., 277 F.2d 456 (1960), affirming W.D.Ky., 177 F.Supp. 205 (1959). There are, however, relevant factual distinctions between Reed and the instant case. For example, in Reed the resolution specifically provided that payments were to be made to the widow "personally;" payments to Widow Reed and to widows in prior instances had not been prescribed in accordance with their deceased husbands' salaries; and not all widows of deceased executives were given such payments. Here, petitioners concede that "each award by Fulton was prescribed with reference to the salary of each respective decedent. * * *" But most importantly, here the fact-finder held the payments to be income, whereas in Reed, the fact-finder determined that the company, when making such payments, "treated each case individually and has followed no regular practice" and that the payments were

gifts. As noted previously, the fact-finder's determination cannot be overturned unless "clearly erroneous."

Upon careful and critical analysis and consideration of this record in totality we are not left with the definite and firm conviction that a mistake has been committed, and, consequently, the decision of the Tax Court is

Affirmed.