**Laura H. GREELY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. No. 2435.

United States District Court D. Montana.

Great Falls Division.

Oct. 28, 1965.

Church, Harris, Johnson & Williams, Great Falls, Mont., for plaintiff.

John B. Jones, Jr., C. Moxley Featherston, Jerome Fink, and W. Forbes Ramsey, Dept. of Justice, Washington, D. C., and Moody Brickett, U. S. Atty., Butte, Mont., for defendant.

JAMESON, District Judge.

This is an action for the recovery of federal income taxes for the calendar year 1960 in the amount of $1,865.27. Plaintiff did not include in her return the sum of $13,000 paid to her by Greely Elevator Company after the death of her husband, M. J. Greely, who had been president of the company. Upon audit of her return, the Internal Revenue Service determined that $5,000 was excludable under the provisions of section 101 (b) of the Internal Revenue Code of 1954,[1] and the remaining $8,000 was treated as additional income to the plaintiff. The deficiency assessed was paid by the plaintiff, followed by timely claim for refund and suit.

---

1. Section 101(b) provides in pertinent part:

"(b) Employees' Death Benefits.—

(1) *General rule.*—Gross income does not include amounts received (whether in a single sum or otherwise) by the beneficiaries or the estate of an employee, if such amounts are paid by or on behalf of an employer and are paid by reason of the death of the employee.

(2) *Special rules for paragraph* (1).—

(A) $5,000 limitation.—The aggregate amounts excludable under paragraph (1) with respect to the death of any employee shall not exceed $5,000.

\* \* \* \* \*

(26 U.S.C.A. Sec. 101)."

The sole question presented is whether the payment of the $13,000, or any part thereof, should be excluded from plaintiff's gross income as a gift under section 102 of the Internal Revenue Code of 1954.[2] The case was submitted on an agreed statement of facts.

M. J. Greely died on October 19, 1959. At the time of his death he had served as president of the company at least five years. Plaintiff was not employed by and was not receiving any compensation from the company. She was, however, financially independent from other sources.

At a special meeting of the Board of Directors of Greely Elevator Company on June 27, 1960, the following resolution was adopted:

"WHEREAS, the Board of Directors realizes that M. J. Greely, deceased, was a valuable employee of said corporation for many years last past; and

"WHEREAS, the said M. J. Greely was employed by this Corporation in the capacity of president up to and including the time of his death on October 19, 1959; and

"WHEREAS, during all the years that the said M. J. Greely was with the said Corporation he performed valuable services for and on behalf of the Corporation apart from the usual duties and responsibilities of his position;

"NOW, THEREFORE, BE IT RESOLVED that the Company pay to Laura Harriet Greely, widow of M. J. Greely, formerly president and director of this Company and recently deceased, the sum of $13,000.-00, said $13,000.00 to be paid to Laura Harriet Greely within the next six months' period from the date of this resolution at such time or times as may be convenient to the Company.

"BE IT FURTHER RESOLVED that at such time of final payment of said amount set forth above to the widow of M. J. Greely, said benefits shall cease and no further payments shall be made by the Company for this purpose."

The salary of M. J. Greely had been paid to the date of his death. For the four years preceding his death, he was paid at the rate of $21,000 annually. For the years 1954 to 1958 he had received an annual bonus of $14,000 and at the close of the corporate fiscal year on June 30, 1959, a bonus of $20,000. He did not receive any bonus for the period July 1, 1959 to October 19, 1959. During the years 1954 through 1961 the corporation never paid less than $72,702.58 or more than $123,550 total bonus to 35 or 40 employees. During the same period the corporation declared $8.00 per share dividend each year.

There were no obligations outstanding on the books of the corporation reflecting any indebtedness to M. J. Greely. At the time of his death Greely owed the company $12,835.87, which was paid by his estate on January 9, 1961.

Greely was a minority stockholder. Of 3,340 shares of stock outstanding, M. J. and Laura Greely were the owners of 476 shares, and their son and daughter each owned 273 shares.

The $13,000 was paid to plaintiff on August 26, 1960. It was recorded on the general ledger of Greely Elevator Company as follows:

Debit—Voluntary Death Benefit
$13,000.00
Credit—Expenses Payable—Laura
H. Greely $13,000.00

The company deducted the payment on its corporate federal income tax return for the fiscal year ending June 30, 1960, as a business expense. It was allowed as a business expense in a subsequent IRS audit.

2. Section 102 provides in pertinent part: "(a) General rule.—Gross income does not include the value of property ac-quired by gift, bequest, devise, or inheritance.
 *    *    *    *    *
(26 U.S.C.A. Sec. 102)."

Plaintiff became a director of Greely Elevator Company following the meeting of the directors held June 27, 1960. She received no compensation for her services and at no time has held any office.

The company did not have an established policy with regard to making payments to surviving spouses of deceased officers or directors. A payment of a "bonus" had been made to the "estate" of C. R. Greely in 1954.[3] T. S. Greely testified in his deposition that there was a policy that if someone left the company he would be given compensation for past services and he thought a similar policy would exist as to death. He indicated that because M. J. Greely's salary had been paid to date of death and bonuses were not payable at the date of death, the payment must have been for past services. He denied that the payment had some relation to the bonus which would have been paid to Greely had he lived. On the other hand, he indicated that consideration was given to the amount of the debt owed by Greely at the time of his death in arriving at the amount to be paid to the widow.

A bonus was authorized by special meeting of the board of directors on June 15, 1959, to be paid to the estate of a deceased employee, Carl E. Peterson. In that instance it was stated that "the estate" would receive a full share in view of the employee's past services.

A letter to the Internal Revenue Service from Greely Elevator Company signed by T. S. Greely, dated September 4, 1963, stated that the payment to plaintiff was made pursuant to "instructions contained in the resolution made by the board of directors to compensate Mrs. Greely for past services rendered by Mr. Greely".

It was stipulated that the Internal Revenue Agent who made the audit would testify that twice during the audit T. S. Greely stated that the $13,000.00 payment was not intended by the corporation as a gift.

It was further stipulated that the accountant for the corporation and plaintiff would have testified in accordance with a letter he had written to the revenue agent and would also have testified that the payment "was in the approximate amount of a debt owed by M. J. Greely at the time of his death to the Greely Elevator Company, and that "this amount may have been a factor in arriving at the actual amount subsequently paid to Laura H. Greely".

The accountant's letter to the revenue agent stated that he deducted the payment to plaintiff from the corporate income tax return "because it was compensation for the services rendered to the corporation by its then deceased president, M. J. Greely". He further stated that on plaintiff's return, he "mentioned that she had received $13,000.00 compensation". By that he meant that the company "had compensated either M. J. Greely or his wife, Laura H. Greely, for the services he had rendered to the corporation. The fair value of these services was $13,000.00". He also stated on the return that he felt that "under recent Tax Court decisions this compensation was tax free". Previous to making the return he had spoken to G. F. Greely, who indicated "that the reason for making the $13,000.00 payment was to compensate either M. J. Greely or his wife for the services that he had rendered to the corporation".

T. S. Greely, the stepson of G. F. Greely, voted for the resolution requiring the payment to the widow at the suggestion of his stepfather. At the time of the passage of the resolution G. F. Greely was in active control of the corporation and formulated its management policies, including the resolution calling for the payment to the widow. T. S. Greely was a newly elected director without

---

3. The minutes of the meeting of the directors held June 14, 1954 contains the following: "G. F. Greely moved that inasmuch as C. R. Greely had performed the duties of an officer and executive of the Company that his estate be paid a bonus of $4,500 for the fiscal year ending June 30, 1954." The record of bonus payments shows that taxes were deducted before payment of $3,637.80 was made.

prior experience in the management of the corporation.

The parties agree that in deciding whether a payment is excludable from gross income as a gift under section 102, the court must determine the "dominant reason" for which the payment was made, after taking into consideration all of the relevant factors. Commissioner of Internal Revenue v. Duberstein, 1960, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218.[4] A brief summary of the holding in Duberstein was set forth in United States v. Pixton, 5 Cir. 1964, 326 F.2d 626, 628, as follows:

"Commissioner of Internal Revenue v. Duberstein, 1960, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed. 1218, [sic] is the latest and leading Supreme Court decision on both the definition of a gift in a 'gift v. income' case and the scope of appellate review of a trial court's application of that definition. In Duberstein the Supreme Court restated the principles established in Bogardus v. Commissioner of Internal Revenue, 1937, 302 U.S. 34, 58 S.Ct. 61, 82 L.Ed. 32, and emphasized that in order for a transfer to qualify as a gift, the transfer must not be motivated by a legal or moral obligation. It must not be a payment for services, past or future, and there must be no expectancy of future gain. Rather, 'the dominant reason that explains [the transferor's] action in making the transfer' a gift must be a ' "detached and disinterested generosity," * * * "out of affection, respect, admira-

tion, charity or like impulses" '. 363 U.S. at 285, [80 S.Ct. at 1197, 4 L. Ed.2d 1218]."

In Duberstein, the Court continued in part:

"And in this regard, the most critical consideration, as the Court was agreed in the leading case here, is the transferor's 'intention'. Bogardus v. Commissioner of Internal Revenue, 302 U.S. 34, 43, [58 S. Ct. 61, 82 L.Ed. 32]. 'What controls is the intention with which payment, however voluntary, has been made.'

\*      \*      \*      \*      \*      \*

Moreover, the Bogardus case itself makes it plain that the donor's characterization of his action is not determinative—that there must be an objective inquiry as to whether what is called a gift amounts to it in reality. 302 U.S. at page 40, [58 S.Ct. at page 64]." (363 U.S. at 285–286, 80 S.Ct. at 1197).[5]

Was the "dominant reason" for the payment to Mrs. Greely a "detached and disinterested generosity * * * out of affection, respect, admiration, charity, or like impulses", as plaintiff contends, or was the payment intended as compensation for services performed by M. J. Greely, as defendant contends?

Both parties rely upon Poyner v. C.I. R., 4 Cir. 1962, 301 F.2d 287, but they disagree with respect to the effect and proper interpretation of that decision. It is important accordingly to consider precisely what was involved and decided in that case.

4. In Duberstein the Court rejected the Government's suggestion that the Court promulgate a new "test" to serve "as a standard to be applied by the lower courts and by the Tax Court". The Court expressed the opinion "that the governing principles are necessarily general and have already been spelled out in the opinions of this Court, and that the problem is one which, under the present statutory framework, does not lend itself to any more definitive statement that would produce a talisman for the solution of concrete cases". (363 U.S. at 284–285, 80

S.Ct. 1190 at 1196). The Court said further: "Decision of the issue presented in these cases must be based ultimately on the application of the fact-finding tribunal's experience with the mainsprings of human conduct to the totality of the facts of each case". (363 U.S. at 289, 80 S.Ct. at 1198).

5. In Bogardus v. Commissioner of Internal Revenue, 1937, 302 U.S. 34, 43, 58 S.Ct. 61, 82 L.Ed. 32, it was held that the erroneous use of the terms "honorarium" and "bonus" did not convert a gift into payment for services.

In Poyner, the decision of the Tax Court was adverse to the widow taxpayer. The Court of Appeals first recognized that the Commissioner of Internal Revenue has sought since 1950 to treat payments to widows of "ranking employees in companies" as ordinary income, whereas, "The widows * * * have contended with considerable success in the courts that the payments were gifts, hence not includible in gross income under section 102." (301 F.2d at 289). In reversing, the court said in part:

> "We think that the findings of the Tax Court regarding the dominant reason for the payments, based as they are upon the stipulated facts, cannot be sustained. The decisions in the Tax Court prior to the Duberstein case established a set of factors to be evaluated in discovering the dominant motive for such payments to widows * * *. The clearest formulation appears in Florence S. Luntz, 29 T.C. 647, 650 (1958), where the Tax Court listed the following as the five factors to be considered:
>
>> '(1) the payments had been made to the wife of the deceased employee and not to his estate; (2) there was no obligation on the part of the corporation to pay any additional compensation to the deceased employee; (3) the corporation derived no benefit from the payment; (4) the wife of the deceased employee performed no services for the corporation; and (5) the services of her husband had been fully compensated.'
>
> The stipulated facts directly respond to every one of the five factors, and in each instance the response is favorable to the widow." (301 F.2d at 291).

The court then proceeded to consider the effect of Duberstein, saying in part:

> "The Supreme Court in Duberstein did not destroy the authority of the earlier Tax Court cases and the guides enunciated in them for discovering motivation.
>
> *       *       *       *       *
>
> "On the other hand, Duberstein cannot be read as limiting inquiry by the trier of fact solely to the factors recognized by the earlier decisions. The objective is to discover which motive is dominant in a field of coexisting motives. In the task of sorting out the varying motives, the development of more reliable criteria by the triers of fact should not be curtailed. Indeed, the Tax Court since Duberstein has considered it necessary to inquire into the widow's stock holdings in the company and the knowledge or lack of it on the part of the Board of her financial status following the death of her husband. The Tax Court in the present case also seems to have thought that the directors' knowledge of 'the widow's needs' was an important factor. These subjects are certainly relevant, and inquiry may properly be directed to them, and whatever other factors the trier of fact might think helpful." (301 F.2d at 292).

The court concluded that while it was proper for the Tax Court to "broaden the field of inquiry beyond that previously established, this should not be done without affording an opportunity to the taxpayer, and to the Government as well, to amplify the record". The case was remanded to give the parties an opportunity to produce additional data which "may have the effect of confirming or overcoming the result which the five Luntz factors, standing alone, were held to require in the earlier cases". (301 F.2d at 292). After remand, the case was settled, apparently for 50 per cent of the amount involved.

Other courts of appeals have considered the effect of Duberstein, and this opinion will be limited to a discussion of some of those cases. In United States v. Kasynski, 10 Cir. 1960, 284 F.2d 143, the court affirmed the finding of the district court that the payment to a widow

constituted a gift. The factual situation was summarized as follows:

"Ainsworth, who had been an officer of the corporation for 30 years prior to his death, had been paid for all services rendered by him. The payments in question were not made to Ainsworth's estate but to his widow. These payments were made in recognition and appreciation of the services which he had rendered. The corporation was under no obligation to make the payments and did so voluntarily. The taxpayer was not required to render services or give anything of value in return for the payments. The corporation had no plan, policy or custom of making payments to widows of its deceased officers or employees. The corporation did not carry the payments on its books as salary and did not deduct social security or withholding taxes but did claim a deduction on its tax returns on account of such payments. Three directors testified that they intended the payments to be a gift to the taxpayer." (284 F.2d at 145).

In Olsen's Estate v. C. I. R., 8 Cir. 1962, 302 F.2d 671, cert. den. 371 U.S. 903, 83 S.Ct. 208, 9 L.Ed.2d 165, the court reversed a decision of the Tax Court assessing a deficiency against the widow of a corporate officer. The resolution adopted by the board of directors in that case contained language similar to that included in the Greely resolution, i. e., it recognized that the deceased officer had performed valuable services for the corporation "apart from the usual duties and responsibilities of his position". The Tax Court had found that the "dominant reason" for the payment "was that the decedent had rendered valuable services to the corporation in the performance of unusual duties and responsibilities over a long period of years; and that the payment proceeded primarily from the 'constraining force of a moral * * * duty' ". (302 F.2d at 673–674). In commenting on this finding the Court of Appeals said:

"We are not aware that a corporation has any moral obligation or duty to make any payment to a widow of a deceased officer or employee who, while he lived, was fully compensated for his services. There is no evidentiary basis for an inference that W. R. Olsen was underpaid. There was evidence that he was fully compensated to the time of his death." (302 F.2d at 674).

The court held that the determination of the Tax Court that the payment to Mrs. Olsen "was not excludable from gross income as a 'gift' is clearly erroneous".[6]

In a subsequent case, Cronheim's Estate v. C. I. R., 8 Cir. 1963, 323 F.2d 706, the court affirmed a decision of the Tax Court holding that the payment to a widow was ordinary income and not a gift. In distinguishing its prior decision in Olsen, the court said in part:

"Certainly there are factual distinctions between the case before us and Olsen * * *. In Olsen, the formal resolution specifically provided that the payments were to be made directly to the widow; there was evidence that Mr. Olsen's death was quite sudden, and that the company felt that the widow 'probably could use the money under those circumstances;' the payment was not measured in accordance with Mr. Olsen's salary; and the company had no plan or policy for making payments to widows of deceased officers or employees, even though on one prior occasion it had made a payment to a widow of a vice-president. Here, to illustrate but one of several important differences from Olsen, it is evident that, while no formalized plan existed, Fulton fol-

6. See also Kuntz' Estate v. C.I.R., 6 Cir. 1962, 300 F.2d 849, 95 A.L.R.2d 515; cert. den. 371 U.S. 903, 83 S.Ct. 208, 9 L.Ed.2d 165; United States v. Frankel, 8 Cir. 1962, 302 F.2d 666, cert. den. 371 U.S. 903, 83 S.Ct. 208, 9 L.Ed.2d 165; United States v. Pixton, supra.

lowed the practice of continuing the salary for varying periods of time to widows and surviving minor children of deceased, long-time executives. Such a policy or practice, while not necessarily decisive, is unquestionably a relevant circumstance to be taken into consideration by the fact-finding tribunal in determining the basic or dominant reason motivating the payment in question." (323 F.2d at 710–711).

The Government relies upon the recent case of Fritzel v. United States, 7 Cir. 1965, 339 F.2d 995, 996, where the corporation adopted a resolution that "in recognition of the services rendered" by the deceased employee, the officers were authorized and directed "to pay a sum of $1,400 monthly to Mrs. M. J. Fritzel for a period of two years from November 1, 1956, as an employee's death benefit by reason of the death of M. J. Fritzel". One of the directors "testified that the directors felt that Fritzel was entitled to a death benefit equal to two years' salary for the 16 years of service he gave to the corporation, that they also weighed the favorable effect that the payment would have on company morale, that the directors were not concerned with plaintiff's needs, and that kindness had nothing to do with making the payment". Another director testified "that the directors felt a moral obligation to further compensate the decedent for his valuable service, particularly since he was only a minor participant in a recently-established profit-sharing plan and was not at all a beneficiary of their new insurance program, and that the directors were also cognizant of the incentive effect that the payment would have on the oth-

er corporate officers and employees" (339 F.2d at 996–97). The district court found that the payment constituted a gift, and the court of appeals reversed, holding that the findings of the district court were clearly erroneous.

In Gaugler v. United States, 2 Cir. 1963, 312 F.2d 681, the court affirmed a judgment in favor of the United States in a refund action by the widow of a corporate officer. The corporate resolution provided for "voluntary payments" to the widow "at the times and equal to the salary which would have been payable to Mr. Gaugler" had he survived and continued employed during the period from January 11, 1952 to December 31, 1952.[7] The payments were recorded as "Executive's Salaries" on the company's books. The court pointed out that the trial judge in reaching his decision had considered a number of clearly relevant factors, as follows:

"(1) the inconsistent accounting and tax treatment by the Company; (2) the existence of a previous practice of making similar payments to widows of high officials of the Company; (3) the computation of the payments in terms of the salary which would have been paid had decedent survived and continued his employment; (4) the fact that the payments were made by a business corporation and that sound business reasons were considered in making them; (5) the 'moral duty' implicit in the special circumstances of the widow's needs to readjust to a lower standard of living; (6) the Company's failure to investigate the actual financial circumstances and needs of the widow." (312 F.2d at 684).[8]

7. It was held in Poorman v. C.I.R., 9 Cir. 1942, 131 F.2d 946, with respect to an additional payment to a taxpayer by his employer, that the fact that the salary paid was the "measuring rod" for the fixing of the additional payment was some evidence that it was compensatory in nature. This case was cited on this point in Gaugler v. United States (footnote 3, page 684).

8. See also Tomlinson v. Hine, 5 Cir. 1964, 329 F.2d 462, where the court reversed a decision of the district court that a payment to a widow was a gift, where (1) the needs of the widow were not considered by the company in fixing the amount of the payment; (2) the company had a practice over the years of making payments to widows; and (3) the company

It appears from the stipulated facts that the plaintiff here meets the five tests set forth in Florence S. Luntz, as restated in Poyner v. C. I. R., supra, and the court finds:

1. The payment was made to the widow and not to the estate of the deceased employee;

2. There was no obligation on the part of the corporation to pay any additional compensation to the deceased employee;

3. The corporation derived no benefit from the payment;

4. The plaintiff performed no services for the corporation; and

5. The services of plaintiff's husband had been fully compensated.

The question arises as to whether other relevant factors suggested by Duberstein and cases decided subsequent thereto "have the effect of confirming or overcoming" the five factors enumerated above in determining the dominant purpose or motive for the payment to the plaintiff.

The defendant's brief quotes extensively from the deposition of T. S. Greely, who was president of the company when his deposition was taken on April 10, 1964, and also relies upon letters from T. S. Greely to an agent of the IRS and oral statements made by Greely to the agent. By reason of the death of G. F. Greely and Eva Greely, subsequent to the death of M. J. Greely, the only person who was available to testify regarding the purpose of the payment was T. S. Greely. It is necessary accordingly to scrutinize his testimony rather carefully. Standing alone the quoted portions of the testimony lend persuasive support to the Government's contention that the payment was not a gift. The

deposition as a whole, however, does not fully support the isolated excerpts from the testimony.

T. S. Greely was a new director when the resolution authorizing payment was adopted on June 27, 1960. The company was managed by G. F. Greely, who succeeded M. J. Greely as president. T. S. Greely testified that M. J. Greely and G. F. Greely, who were brothers, got along, but "I myself did not get along with M. J. Greely". As far as he knew there was no feeling on the part of G. F. Greely that plaintiff might want to take a more active part in the affairs of the corporation. With respect to his own feelings he testified:

"A Well, personally and—well, I was looking at it as a minority stockholder at the time, and, with the intention of trying to become the majority stockholder.

Q So you were perhaps concerned about this? Let me rephrase the question, were you thinking about this?

A Not about her. But she had a son that was coming out of school, and some day it was either going to be himself or myself that would become president of the company."

Greely testified further that after the death of M. J. Greely "everybody turned to G. F. Greely" for leadership. "It was as simple as that, because he was the only one that had the experience * * * because nobody else could run the company." The idea of the payment of $13,-000 to the widow originated with G. F. Greely. T. S. Greely did not question it.[9] He did not know if he "were for the resolution", "but it never even entered my mind to oppose it. I was just going along with what he wanted. I knew

regarded the payment as "serving a business purpose and being economically beneficial to it".

9. Greely testified:
"Whatever he wanted to do at that time, everybody went along with it. See, you got a situation here where he was the only one that had any experience

in this office at all. He had been in the office since 1923. I had never been in the office, I spent all my time in the country. Except for on and off, once in a while, for a few days here and there. And when—well, there was just nobody that knew anything about the workings of that office outside of Gib Greely."

that's the way it was going to be." He assumed the payment was for past services. With reference to how the $13,000 was arrived at, Greely testified:

"Q How was the amount of $13,000 arrived at?

A Well, he owed the company $13,000, and that's pretty much the way it was arrived at, I would guess."

Greely did not think the $13,000 had any relation to the bonus that would have been paid M. J. Greely had he lived. While he understood that the payment was to be compensation for services Mr. Greely had rendered, he wasn't sure.[10]

T. S. Greely did not think Laura Greely needed the $13,000, as he had heard "Mike had considerable amount of insurance". In response to specific questions, he testified that he did not feel sorry for Laura Greely, or compassionate.[11] Greely did not remember whether the Internal Revenue agent had asked him whether the payment was a gift or whether he had told the agent it was not a gift.[12]

It is clear from the deposition that the decision to make the payment to the widow was that of G. F. Greely and that T. S. Greely did not participate in the making of the decision or question it.

Rather, "everybody went along with whatever G. F. Greely wanted to do". Many times during the course of his deposition, T. S. Greely answered, "I don't remember, but would guess * * I think so. I can't be sure of that * * I assume." Under the circumstances his answers to leading questions regarding his own motive and purpose in presenting and voting for the resolution are of limited probative value. The court's decision must be based primarily on the "reasonable inferences from the factual pattern presented" by the evidence in its totality. (Cf. United States v. Kasynski, supra; Kuntz' Estate v. C. I. R., supra; Olsen's Estate v. C. I. R., supra).

Comparing the instant case with two cases decided by the Eighth Circuit since Duberstein, Olsen's Estate v. C. I. R., supra, (reversing the decision of the Tax Court that the payment to the widow was ordinary income) and Cronheim's Estate v. C. I. R., supra, (affirming the Tax Court), it appears to me that the factual situation presented here is more nearly that of Olsen. In particular, past salary was not used as a yardstick in arriving at the payment, the payment was not treated as "salary" on the corporation books, although it was entered under "expenses payable" and was deducted as a business expense, and there was not an established plan or policy to

10. Greely testified in part:
"Q Is that the understanding that you had when you voted for the resolution and introduced it?
A I think so. I can't be sure of that. To tell you the truth, in order to refresh my memory when this came up, I had to go to the minutes to see just what we did."

11. On this point Greely testified:
"Q You didn't feel sorry for her in any way?
A No.
Q Or compassionate?
A No.
Q You couldn't classify your motives of being one of disinterested generosity, would you?
A No.
Q This was a business decision?
A It was a business decision.

Q Made for business reasons?
A Made, evidently, because everybody seemed to feel he had done a job in the past and let's do this for him."

12. Greely testified:
"Q If he (the Internal Revenue agent) said that you had made this statement, would you feel that this statement is contrary to something you could have said, because it is contrary to your understanding of the transaction?
A Well, I don't say it's contrary to something I might have said. There could have been a misunderstanding on my part or misunderstanding on his part. I don't remember whether there was or not. If I specifically said it, I don't remember it. But I don't say that it is impossible that I may have said it."

make payments to widows of deceased employees.[13]

Cronheim and other cases have considered as significant the employer's regard or lack of regard for the financial condition of the widow. It is stipulated here that the widow was financially independent from other sources. This factor of course is favorable to the Government's position, as is the fact that the payment was taken and allowed as a business expense. Neither factor, however, is decisive.[14] Also favorable to the Government's position are the statements of the accountant that the payment was "compensation for the services rendered to the corporation by its then deceased president"; that by that he meant that the corporation "had compensated either M. J. Greely or his wife, Laura H. Greely, for services he had rendered the corporation" and that the "fair value of the services was $13,000". On the other hand, the accountant stated on the taxpayer's return that he felt that "under recent Tax Court decisions this compensation was tax free".

Particularly in view of the accountant's opinion that this was a tax free payment under recent decisions of the Tax Court, it seems questionable whether he distinguished clearly between compensation in the sense of salary or bonus for past services and payments "in recognition and appreciation of services rendered" (Cf. U. S. v. Kasynski, supra) or payments for "valuable services * * * apart from the usual duties and responsibilities". (Cf. Olsen's Estate v. C. I. R., supra). "A gift is none the less a gift because inspired by gratitude for the past faithful services of the recipient". Bogardus v. Commissioner of Internal Revenue, supra (302 U.S. at 44, 58 S.Ct. at 66). The same is true of a payment to a widow.[15]

In addition to the five findings heretofore made, I find:

6. The company had no established plan or policy for making payments to widows of deceased officers and employees.

7. The payment to plaintiff was not measured in accordance with her husband's salary, and no taxes were deducted from the payment. The payment was not carried as salary on the company's records and the company did not pay any taxes thereon.

8. The evidence fails to establish any relation between the payment to the widow and the payment of a "bonus". The payment was not included on the list of "Bonuses" for the year ending June 30, 1960.

13. These have been considered significant factors in many of the cases holding that the payment to a widow was ordinary income rather than a gift. In addition to Cronheim's Estate v. C.I.R., supra, see Spear v. Vinal, D.C., 240 F.Supp. 33, and cases there cited.

14. It was recognized in Duberstein that it is relevant that the transferor treats a payment as a business deduction, and that the transferor is a corporation, but the Court said: "Neither factor is a shibboleth. The taxing statute does not make nondeductibility by the transferor a condition on the 'gift' exclusion; nor does it draw any distinction, in terms, between transfers by corporations and individuals, as to the availability of the 'gift' exclusion to the transferee. The conclusion whether a transfer amounts to a 'gift' is one that must be reached on consideration of all the factors." (363 U.S. at 287–288, 80 S.Ct. at 1198).

15. In Kuntz' Estate v. C.I.R., supra, the resolution itself expressly provided that the payment "is made as additional compensation and in consideration of services heretofore rendered to this corporation" by the decedent. The Tax Court found that the payment was compensation and not a gift for the reasons and purposes set forth in the resolution. In reversing, the Court of Appeals stated, inter alia, "The fact that a transaction is stated to be a particular type of transaction does not necessarily mean that it is that type". (300 F.2d at 851). The Court held that the intention of the transferor to make a gift was "a reasonable inference from the 'factual pattern' here present, and that the contrary finding by the Tax Court leaves us with the 'definite and firm conviction that a mistake has been committed'". (300 F.2d at 852).

9. On one prior occasion the company had paid a "bonus" to the "estate" of a deceased officer and had deducted all taxes before making the payment.[16]

10. It sems probable that in making the payment the company took into consideration the fact that the decedent was indebted to the company in the amount of $12,835.87.

11. The payment was debited on the books of the company to "voluntary death benefit" and credited to "expenses payable".

12. The payment was taken and allowed as a business expense on the corporation's tax return.

13. There is no evidence that the company considered the financial situation of the widow in making the payment. The widow was financially independent from other sources.

14. T. S. Greely in a letter to the Internal Revenue Service stated that the company was following instructions contained in the resolution of the board of directors "to compensate Mrs. Greely for past services rendered by Mr. Greely". Greely and the accountant for plaintiff and the company have referred to the payment as compensation for past services M. J. Greely rendered the corporation, as herein discussed.

15. Even though Greely and the accountant have referred to the payment as compensation for past services, it may reasonably be inferred from the evidence as a whole that the payment was in fact a gift in recognition and appreciation of past services rather than compensation for past services.

16. The payment did not proceed primarily from the "constraining force of any legal or moral duty" or from the "incentive of anticipated benefit of an economic nature". Rather it resulted from a "detached and disinterested gen-erosity", and this was the "dominant reason" for the payment.

On the basis of the foregoing findings and under the authority of Poyner v. C. I. R., supra, Olsen's Estate v. C. I. R., supra, and other cases discussed herein, I conclude that the payment was a gift and accordingly was excludible from plaintiff's gross income under section 102 of the Internal Revenue Code of 1954.

Pursuant to Rule 11(b) of the local rules of court, plaintiff will prepare, serve and lodge form of judgment in accordance with the foregoing findings, conclusions and opinion.

---

16. In 1954 the company made a bonus payment to the estate of a deceased officer, deducted therefrom all taxes, and showed the payment on a list of bonus payments as of June 30, 1954. For the year ending June 30, 1959, a deceased employee was shown on the list of "bonuses" and the tax deducted therefrom. The list of "bonuses" for the year ending June 30, 1960, does not include the name of M. J. Greely, and no taxes were deducted from the payment to Mrs. Greely.